IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| CARYL VONDRA, Personal Representative of the Estate of Melvin Vondra, WILLIAM MEYERS, Personal Representative of the Estate of Patricia Meyers, and COREY ILG, Personal Representative of the Estate of Duane Ilg, | ) ) ) ) ) ) ) | |
| | ) | 8:07CV85 |
| Plaintiffs, | ) ) ) | |
| v. | ) ) | MEMORANDUM AND ORDER |
| CHEVRON U.S.A., INC., SHELL CHEMICAL L.P., SHELL OIL COMPANY, UNION OIL COMPANY OF CALIFORNIA, BARTON SOLVENTS, INC., and CITGO PETROLEUM CORPORATION, | ) ) ) ) ) ) ) | |
| Defendants. | ) ) | |

This matter is before the court on the defendants' motions for summary judgment, Filing Nos. 187, 190, and 198, and motions for hearings thereon, Filing Nos. 188, 192, and 200. The court finds there is no need for a hearing or oral argument on the motions for summary judgment, and the motions for a hearing will be denied. This is a wrongful death products liability action based on exposure to chemicals. In their Fourth Amended Complaint, plaintiffs assert negligence and strict liability claims for defective design and failure to warn, breach of implied warranty, failure to utilize a reasonable alternative under section 2(B) of the Restatement (Third) of Torts, and negligent failure to warn. The plaintiffs' decedents were all employees of Goodyear Tire & Rubber Co. ("Goodyear") in Lincoln, Nebraska. The plaintiffs allege their decedents sustained injuries, including contracting the disease Acute Myelogenous Leukemia ("AML"), by exposure to solvents containing benzene. Defendants Barton Solvents, Chevron U.S.A. Inc., Citgo Petroleum

Corporation, Shell Chemical, L.P., d/b/a Shell Chemical Company, Shell Oil Company, and Union Oil Company of California, d/b/a Unocal Corporation, sold products containing benzene to Goodyear.

Defendant Citgo Petroleum Corporation ("Citgo") asserts that it cannot be liable for any alleged exposure that took place prior to March 18, 1983, because it did not exist until then and is not the successor to any prior entity. It also asserts that it cannot be liable for the claims of Melvin Vondra, who retired in 1994 and Patricia Meyers, who retired in 1995, because they cannot establish that they were ever exposed to a Citgo product.

All of the defendants contend that they did not, as a matter of law, owe a duty to warn of an unreasonably dangerous product because Goodyear was a "sophisticated user" of the products. They also argue that they are entitled to summary judgment on the plaintiffs' strict liability and implied warranty claims because they did not sell or distribute any "unreasonably dangerous" products to Goodyear or fail to adopt a reasonable alternative design. Further, the defendants argue that there is no evidence to establish proximate causation, an essential element of the plaintiffs' claims.

## I. BACKGROUND

The parties have submitted voluminous evidence in support of their respective positions. See Filing Nos. 193, 194, 195, 196, 197, 198, 202, 208, 209, & 210, Indices of Evidence ("Evid."). In their respective briefs, the parties agree to many undisputed facts. See Filing Nos. 191, 199, 206, 214, & 215, Briefs. The following facts are gleaned from the parties' statements of undisputed facts. Essentially, the parties agree that the plaintiffs' decedents, Melvin Vondra, Duane Ilg and Patricia Meyers, contracted and died of Acute Myelogenous Leukemia ("AML"). Goodyear Lincoln is a rubber products facility that

manufactures V-belts for use in a wide range of mechanical operations. Duane Ilg worked at Goodyear from 1984 until he officially retired in January 2006. Patricia Meyers worked at Goodyear Lincoln from July 1965 to July 1995. She officially retired in August 1995. Melvin Vondra began to work at Goodyear in 1968 and retired in 1994.

There is no dispute that Goodyear has been a longtime member of the National Safety Council and was aware, beginning in 1926, that dangers were associated with industrial uses of benzene. In a 1926 report, the National Safety Council Committee warned that there was a danger of chronic benzene poisoning arising from prolonged or repeated exposure to benzene fumes in the rubber industry. It recommended precautions such as increased ventilation to decrease workers' exposure to benzene and blood tests to detect and control incipient poisoning at the earliest possible stages. As early as 1942, Goodyear was testing workers for blood changes associated with exposure to benzene.

In 1969, Goodyear, other tire manufacturers, and employee Unions entered into a joint venture, known as the Joint Occupational Health Program ("JOPH") to evaluate the potential health hazards of occupational exposure to chemicals and solvents in rubber-industry workers. The University of North Carolina School of Public Health conducted several studies as part of the program. Goodyear's local union in Lincoln, Nebraska, Local 286 of the United Rubber, Cork, Linoleum and Plastic Workers of America ("URW"), participated in the program.

In 1974, the National Institute for Occupational Safety and Health ("NIOSH"), in a published report entitled "Criteria for a Recommended Standard, Occupational Exposure to Benzene," recommended that workers should not be exposed a concentration of

benzene greater than 10 parts per million (ppm) parts of air, determined by a time-weighted average ("TWA") exposure for up to a 10-hour workday and 40-hour workweek.

Louis Beliczky, a certified industrial hygienist employed by the URW, was a review consultant for that report. At least as early as 1975, following a site visit by Mr. Beliczky, Goodyear was aware that workers at Goodyear's Lincoln, Nebraska plant ("Goodyear Lincoln") were coming into direct contact with chemicals that might be carcinogenic and was advised of inadequate ventilation at the plant. Mr. Beliczky authored a report based upon that visit. Attached to the Beliczky report was an epidemiological study about solvent exposure and leukemia among rubber workers. The president of Local Union 286 received a copy of the report.

In 1976, after a walk-through of a Goodyear division for an epidemiologic evaluation of mortality patterns among employees using benzene, the National Institute for Occupational Safety and Health ("NIOSH") reported that Goodyear performed monthly white blood and hemoglobin counts of certain employees exposed to benzene and removed employees who exhibited decreased white blood cell counts from areas where they could be exposed. NIOSH recommended that "[e]xposure to benzene should be controlled so that no worker will be exposed to benzene in excess of 1 ppm as determined by an air sample collected at one liter/minute for two hours." The president of Local 286 was forwarded the Occupational Health Studies News Letter from the University of North Carolina on studies involving leukemia and other blood related diseases and deaths associated with Goodyear's Pliofilm operations. In 1977, NIOSH reported on the deaths of Goodyear Pliofilm workers and its report showed a significantly increased risk of AML among Goodyear Pliofilm workers exposed to benzene.

At least by 1977, Goodyear purchased more than twenty (20) types of petroleum-derived solvents for use in the manufacture of tires, belts, hose sealants, cements, adhesives and numerous other products. It purchased these solvents primarily in bulk quantities. Goodyear assigned codes to the solvents and did not identify them by name. It used its own internal code names for identifying the rubber solvents used in its plants. At that time, OSHA estimated that 60,000 facilities with over 400,000 workers were engaged in industrial operations using liquid mixtures containing 1% or less benzene by volume.

Goodyear Lincoln authorized the JOPH to conduct an environmental survey of its plant in order to locate health hazards and recommend control measures. All normal first-shift operations were observed and engineering control measures, personal protective equipment and general exposure-related work procedures were observed and evaluated. Several bulk samples were procured for analysis by the Occupational Health Studies Group laboratory. Several management employees of Goodyear Lincoln and also the president and other members of the local union participated in the environmental survey. As part of the 1977 environmental survey, air monitoring samples, including samples for benzene, were obtained from various locations throughout Goodyear Lincoln. A Ventilation Survey was also conducted of the entire Goodyear Lincoln plant.

In 1977, NIOSH published a report entitled "Criteria for a Recommended Standard, Occupational Exposure to Refined Petroleum Solvents," which provided "that workers shall not be exposed to rubber solvents containing benzene at a concentration greater than a TWA concentration of 200 milligrams per cubic meter of air for up to a 10 hour work shift and a 40 hour week." All Goodyear local union presidents received a JOPH study entitled

"An Epidemiological Study of Leukemia Among Rubber and Tire Industry Workers," which correlated benzene exposures in rubber plant workers with an apparent increased association with leukemia. As part of Goodyear's participation in JOHP, Goodyear's director of occupational health received copies of University of North Carolina reports on benzene exposure, leukemia and mortality rates. Pamphlets and newsletters that discussed practices for minimizing exposure to Benzene were disseminated to the participants in the JOPH studies.

In 1978, Goodyear was the world's largest tire company with 1977 sales of 6.6 billion dollars, and the 22nd largest manufacturing company in the United States, with the tenth largest number of worldwide employees. The evidence includes the testimony of several Goodyear occupational health managers at OSHA's 1978 Benzene Standard rulemaking process. In that testimony, Goodyear representatives stated that its information indicated that petroleum solvents suitable for tire building contain from .11 to .63 percent benzene. Goodyear management authored a training manual about benzene safety in 1978.

In 1983, in response to OSHA's request for information on strategies for controlling the level of benzene in the workplace, a Goodyear safety manager recommended that the control strategy for further reducing exposure to benzene be left to the employer. OSHA published its Final Rule on Occupational Exposure to Benzene in 1987, reducing the permissible exposure level to 1 part benzene per million parts of air, based upon an 8-hour time weighted average. *See* 29 C.F.R. Part 1910.

In opposition to the motion, the plaintiffs have presented evidence that shows that, although the URW International Union may have received information about benzene

dangers and a safety training manual, there is no evidence that it was distributed to Union members. The plaintiffs presented evidence that shows that Goodyear's employees at the Lincoln plant were not familiar with a training program, entitled *Health Training for Working with Benzene*, allegedly implemented in 1978. There is no evidence that occupational health instructors taught any or all of the seven lesson modules of *Health Training for Working with Benzene*. Plaintiff William Meyers, personal representative for the estate of his late wife, Patricia Meyers, testified that he also works at Goodyear's Lincoln plant and was never offered training similar to *Health Training for Working with Benzene*. Several other former Goodyear employees also testified that they were not offered training.

Further, plaintiffs presented evidence that their decedents and other Goodyear employees had not been provided or used air filtering or monitoring devices. Patricia Meyers testified that she was not offered gloves to wear until the last few years of her employment and that she did not participate in the personal air monitoring program. The evidence shows that the plaintiffs' decedents' blood was not tested until they had worked for Goodyear for many years and tested only sporadically.

Plaintiffs also presented evidence that the only safe concentration of Benzene is zero and that defendants knew how to reduce the concentration of benzene-containing solvents to nearly zero by 1950. The defendants dispute that evidence. There is also evidence that the defendants would not supply Goodyear with benzene-free solvent. The parties disagree with respect to the significance of the evidence.

Defendant Citgo presented evidence that it did not manufacture, distribute, or sell any of the products alleged to have harmed plaintiffs' decedents Melvin Vondra or Patricia

7

Meyers until May 1, 1997, after Vondra and Meyers had retired. The plaintiffs do not challenge that evidence.

## II. DISCUSSION

### A. Law

Summary judgment is appropriate when, viewing the facts and inferences in the light most favorable to the nonmoving party, "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); [Harder v. ACandS, Inc., 179 F.3d 609, 611 (8th Cir. 1999)](). The burden of establishing the nonexistence of any genuine issue of material fact is on the moving party. Fed. R. Civ. P. 56(c); [Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970)](). Therefore, if defendant does not meet its initial burden with respect to an issue, summary judgment must be denied notwithstanding the absence of opposing affidavits or other evidence. [Adickes, 398 U.S. at 159-60](); [Cambee's Furniture, Inc. v. Doughboy Recreational Inc., 825 F.2d 167, 174 (8th Cir. 1987)](). If the moving party meets the initial burden of establishing the nonexistence of a genuine issue, the burden then shifts to the opposing party to produce evidence of the existence of a genuine issue for trial. [Johnson v. Crooks, 326 F.3d 995, 1006 (8th Cir. 2003)](). A "genuine" issue of material fact exists "when there is sufficient evidence favoring the party opposing the motion for a jury to return a verdict for that party." *Id.*

In determining whether a genuine issue of material fact exists, the evidence is to be taken in the light most favorable to the nonmoving party. *Id.* "In ruling on a motion for summary judgment, a court must not weigh evidence or make credibility determinations."

*Kenney v. Swift Transp., Inc.*, 347 F.3d 1041, 1044 (8th Cir. 2003). "Where the unresolved issues are primarily legal rather than factual, summary judgment is particularly appropriate." *Koehn v. Indian Hills Cmty. Coll.*, 371 F.3d 394, 396 (8th Cir. 2004).

Under Nebraska law, a breach of implied-warranty claim (under contract law) is merged with a product liability claim for defective product design and failure to warn. *Freeman v. Hoffman-La Roche, Inc.*, 618 N.W.2d 827, 843 (Neb. 2000) (noting the law governing liability for harm to persons from the sale of defective products requires a consistent definition of defect that should properly come from tort law, whether the claim carries the label of tort or implied warranty of merchantability). A plaintiff can recover for a product defect under the theory of negligence or the theory of strict liability in tort. *Id.* at 845. In order to recover under a negligence theory, a plaintiff must establish a duty, a breach, causation, and damages. *Morris v. Chrysler Corp.*, 303 N.W.2d 500, 502 (Neb. 1981). To recover on a theory of strict liability, the plaintiff must prove that: (1) the defendant placed the product on the market for use and knew, or in the exercise of reasonable care should have known, that the product would be used without inspection for defects; (2) the product was in a defective condition when it was placed on the market and left the defendant's possession; (3) the defect is the proximate or a proximately contributing cause of the plaintiff's injury sustained while the product was being used in a way and for the general purpose for which it was designed and intended; (4) the defect, if existent, rendered the product unreasonably dangerous and unsafe for its intended use; and (5) the plaintiff's damages were a direct and proximate result of the alleged defect. *Krajewski v. Enderes Tool Co., Inc.*, 469 F.3d 705, 708-09 (8th Cir. 2006); *Haag v. Bongers*, 589 N.W.2d 318, 328 (Neb. 1999); Restatement (Second) of Torts § 402A.

9

"Unreasonably dangerous" means that a product has a propensity for causing physical harm beyond that which would be contemplated by the ordinary user or consumer who purchases it, with the ordinary knowledge common to the foreseeable class of users as to its characteristics. *Krajewski*, 469 F.3d at 708-09; *Rahmig v. Mosley Mach. Co., Inc.*, 412 N.W.2d 56, 69 (Neb. 1987) (adopting consumer expectations test for strict liability under Restatement (Second) of Torts § 402A). A product may be defective and unreasonably dangerous because the product was sold without sufficient warnings or instructions. *Id.*; *Haag*, 589 N.W.2d at 329.

Comment k to 402A of the Restatement (Second) of Torts, provides an exception from strict liability when a product is deemed "unavoidably unsafe." Restatement (Second) of Torts, § 402A, cmt. k (referring to prescription drugs). In Nebraska, that exception does not provide a blanket immunity from strict liability, but must be applied on a case-by-case basis as an affirmative defense. *Freeman*, 618 N.W.2d at 834.

With respect to "Chattel Known to be Dangerous for Intended Use," the Restatement (Second) of Torts provides:

> One who supplies directly or through a third person a chattel for another to use, is subject to liability to those whom the supplier should expect to use the chattel with the consent of the other or to be in the vicinity of its probable use, for bodily harm caused by the use of the chattel in the manner for which and by a person for whose use it is supplied, if the supplier
>
> > (a) knows, or from facts known to him should realize, that the chattel is or is likely to be dangerous for the use for which it is supplied;
> >
> > (b) and has no reason to believe that those for whose use the chattel is supplied will realize its dangerous condition; and
> >
> > (c) fails to exercise reasonable care to inform them of its dangerous condition or of the facts which make it likely to be so.

Restatement (Second) of Torts § 388 (1965). The "sophisticated user" defense has its genesis in subsection (b) of Section 388, which has been interpreted in Nebraska to mean that "there is no duty to warn if the user knows or should know of the potential danger, especially when the user is a professional who should be aware of the characteristics of the product." *Strong v. E.I. DuPont de Nemours Co., Inc.*, 667 F.2d 682, 687 (8th Cir. 1981) (applying Nebraska law); *see also Vadelune v. 4B Elevator Components Unlimited*, 148 F.3d 943, 946 (8th Cir. 1998) (applying Section 388 under Iowa law); *Erickson v. Monarch Indus.*, 347 N.W.2d 99, 108 (Neb. 1984) (stating that "warning of a product's defects is unnecessary where the supplier of the product has reason to believe that those who will use it will have such special experience as will enable them to perceive the danger") (quotation omitted). Under the sophisticated user defense, a supplier has no duty to warn the ultimate user if it has reason to believe that the user will realize its dangerous condition. *Gray v. Badger Mining Co.*, 676 N.W.2d 268, 276 (Minn. 2004); *see also Ritchie v. Glidden*, 242 F.3d 713, 724 (7th Cir. 2001) (stating, under Indiana law, that the sophisticated purchaser defense to a failure-to-warn claim brought under negligence or strict liability theories provides that product suppliers do not have a duty to warn employees or customers of knowledgeable industrial purchasers as to product-related hazards).

In addition to limiting a supplier's duty, the "sophisticated user" concept also affects the element of proximate cause. *Crook v. Kaneb Pipe Line Operating P'ship, L.P.*, 231 F.3d 1098, 1102 (8th Cir. 2000) (holding that if a user actually knows of the danger, a failure to warn cannot be a proximate cause of the injury); *Strong*, 667 F.2d at 688 ("Even if [the defendant] was under a duty to warn, its failure to do so could not have been the proximate cause of the accident because [the employer] and the plaintiff's decedent [a

supervisory employee] were aware of the danger"); *Peitzmeier v. Hennessy Indus., Inc., 97 F.3d 293, 300 (8th Cir.1996)* (same); *Hammond v. Nebraska Natural Gas Co., 204 Neb. 80, 86, 281 N.W.2d 520, 524 (1979)* (holding that failure to warn of a gas leak "could not have been a proximate cause of the accident" if the gas company already knew of the leak). Accordingly, under Nebraska law, the "rule of the 'sophisticated user' is no more than an expression of common sense as to why a party should not be liable when no warnings or inadequate warnings are given to one who already knows or could reasonably have been expected to know of the dangers." *Crook,* 231 F.3d at 1102 (noting that constructive knowledge of a danger will suffice to limit a duty to warn, but actual notice is required to negate proximate cause).

The sophisticated user defense is an analog to the "learned intermediary" defense as described in § 6(d) of the Restatement (Third) of Products Liability. *See, e.g., Freeman,* 618 N.W.2d at 842 (adopting learned intermediary doctrine for prescription drugs). Courts have held, however, that the rationale for the learned intermediary doctrine, that a patient may obtain a product only through a qualified professional who presumably will explain the dangers of the product to the patient, "cannot sensibly be stretched to apply" in all industrial employer/employee situations. *See, e.g., Donahue v. Phillips Petroleum Co. 866 F.2d 1008, 1013 n.9 (8th Cir. 1989)* (applying Missouri law).

In certain situations, a bulk supplier may discharge his duty to warn by giving warnings to a third person, an intermediary. *See* Restatement (Second) of Torts § 388, comment n. The Restatement focuses on the conduct of the supplier of the dangerous product, not on the conduct of the intermediary, and requires that the conduct be reasonable. *O'Neal v. Celanese Corp.,* 10 F.3d 249, 251 (4th Cir. 1993) (noting that focus

remains on the conduct of the supplier, but that conduct is judged in light of the circumstances); *see also Jay v. Moog Automotive*, 264 Neb. 875, 881 ( Neb. 2002) (noting that the manufacturer's conduct is at issue, that is, whether the manufacturer's conduct was reasonable in view of the foreseeable risk of injury). Thus, proof that an intermediary knows the product is dangerous will not always absolve the supplier of a duty to warn ultimate consumers. *O'Neal*, 10 F.3d at 251; *see also Gray v. Badger Mining Co.*, 676 N.W.2d 268, 274-77 (Minn. 2004); *Hall v Ashland*, 625 F. Supp 1515 (D. Conn. 1986) (knowledge of a risk is not the same as knowledge of the extent of the risk); *Whitehead v. Saint Joe Lead Co.*, Inc., 729 F.2d 238, 253 (3d Cir. 1984) (rejecting the theory that the fact that bulk sales of natural materials are made to industrial purchasers who might be termed "knowledgeable users" should insulate the manufacturers of the materials from any duty to warn and affirming the denial of summary judgment to a lead manufacturer on theory that it sold lead to employer who was knowledgeable user and that dangers of lead were well known); *Oman v. Johns-Manville*, 764 F.2d 224, 233 (4th Cir. 1985) (finding no error in court's refusal to instruct jury that the fact that the plaintiff's employer was a sophisticated user cut off the manufacturer's duty to warn). "Giving a third person through whom the chattel is supplied all the information necessary to its safe use" is not always sufficient to relieve the supplier from liability; the issue is whether this method "gives a reasonable assurance that the information will reach those whose safety depends on their having it." Restatement (Second) of Torts § 388, comment n; *Adams v. Union Carbide Corp.*, 737 F.2d 1453, 1465 (6th Cir. 1984) ("[T]he [supplier's] duty to warn may be discharged by providing information of the dangerous propensities of the product to a third person . . . upon whom it can reasonably rely to communicate the information to the

13

ultimate users of the product"); *Weekes v. Michigan Chrome & Chemical Co.*, 352 F.2d 603, 607 (6th Cir.1965) ("[D]efendant was required to exercise reasonable care . . . to reasonably assure itself that its immediate vendee and distributor was so informed as to be able and likely to transmit . . . knowledge of [the product's] dangers."); *In re Brooklyn Navy Yard Asbestos Litigation*, 971 F.2d 831, 838 (2d Cir.1992) (stating that "[t]he sophisticated intermediary doctrine protects a manufacturer from liability only if the chain of distribution is such that the duty to warn ultimate users should fall on an intermediary in that chain, rather than on the manufacturer"); *Smith v. Walter C. Best, Inc.*, 927 F.2d 736, 741 (3rd Cir.1990) (weighing totality of factors is required to determine reasonableness of reliance on a third party as a conduit of necessary product information); *Stuckey v. Northern Propane Gas Co.*, 874 F.2d 1563, 1568 (11th Cir.1989) (holding that a supplier's duty to warn an ultimate consumer can be discharged by a warning given to an intermediary, but focus is on whether the intermediary's knowledge was sufficient to protect the ultimate consumer); *Hunnings v. Texaco, Inc.*, 29 F.3d 1480 (11th Cir. 1994) (holding that manufacturers of inherently dangerous products do not enjoy blanket protection from liability because others in chain of distribution reformulate or repackage it and stating that "[i]f a manufacturer knows or should know that downstream distributors are not giving adequate warnings to the end user of a product, then the bulk manufacturer may be held liable for failing to take appropriate action").

The finder of fact must consider a variety of factors in order to determine whether a supplier's reliance on an intermediary to warn ultimate users was reasonable. *O'Neal*, 10 F.3d at 252; *Gray v. Badger Mining Corp.*, 676 N.W.2d at 278 (stating that the sophisticated intermediary defense is generally only available where the supplier can show

that it used reasonable care in relying upon the intermediary to give the warning to the end user). Those factors include:

> (1) the dangerous condition of the product; (2) the purpose for which the product is used; (3) the form of any warnings given; (4) the reliability of the third party as a conduit of necessary information about the product; (5) the magnitude of the risk involved; and (6) the burdens imposed on the supplier by requiring that he directly warn all users.

*Eagle-Picher Industries, Inc. v. Balbos*, 604 A.2d 445, 464 (Md. 1992); *see* Restatement (Second) of Torts § 388 cmt. n. Courts typically apply the sophisticated intermediary defense when: (1) the employer maintained full knowledge of the range of dangers equal to that of the manufacturer; or (2) the manufacturer made the employer knowledgeable by providing adequate warnings and safety instructions to the employer. *Gray v. Badger Mining Corp.*, 676 N.W.2d at 277-78.

### 2. Analysis

The defendants argue that the uncontroverted evidence that Goodyear was knowledgeable concerning the dangers of benzene and that the defendants, as suppliers, had no duty to warn the ultimate users of the dangers. Defendants' arguments are an amalgam of the "sophisticated user," "bulk supplier," and "learned intermediary" defenses. The parties contend that resolution of this issue requires the court to determine whether Nebraska courts have adopted, or are likely to adopt this defense or defenses. The court finds, however, that it need not make that determination because even if such a defense is available in Nebraska, the defendants have not presented evidence that shows, as a matter of law, that they are entitled to the defense. At this point in the litigation, the defendants have not shown that any combination of these theories would shield them from liability. All of these defenses require a defendant to show that reliance on a third party to

warn ultimate users of a product's dangers is reasonable.  The evidence does not establish reasonable reliance.

In order to be absolved of liability, defendants must not only show that they took reasonable steps to warn end-users of the dangers associated with benzene through their intermediary, but that it was reasonable for them to rely on the intermediary to impart the warnings.  The evidence presented to the court does not establish either of these facts.  Although defendants have shown that Goodyear had some level of knowledge and awareness of the dangers associated with benzene, they have not shown that it was reasonable for the defendants to rely on Goodyear to convey the appropriate warnings to its employees, who were foreseeable end-users of the products.  There has been no showing that the defendants actually apprised Goodyear of the dangers, that Goodyear fully appreciated those dangers, or that they acted in a manner reasonably calculated to ensure that the necessary information would be passed on to the ultimate handlers of the products.  Defendants have not shown that they attempted to ascertain the extent to which Goodyear was disseminating information about the dangers of the product.

The court finds there are genuine issues with respect to numerous material facts. The evidence regarding the nature and extent of the defendants' knowledge of the danger, Goodyear's knowledge of the danger, and the plaintiffs' decedents' knowledge of the danger is in dispute.  The adequacy of Goodyear's warnings or safety measures is at issue, and there are conflicts in the evidence with respect to when and to what extent the plaintiffs' decedents could have appreciated the specific danger of benzene exposure. There is further conflicting evidence on whether it was possible or feasible for the defendants to eliminate the danger and on whether there is any safe level of exposure to

benzene. Plaintiffs have presented evidence that defendants did not adhere to specifications that Goodyear made with respect to benzene content and that they inaccurately advised Goodyear that it was not feasible to remove all of the benzene from petroleum solvents used in the manufacture of tires. There is also some evidence that the defendants were aware of some of the risks of benzene as early as 1943 and aware of that it could reduce the concentration of benzene in its solvents through fractional distillation as early as 1950.

There are also genuine issues of material fact with respect to the plaintiffs' decedents' exposure to the chemical. Although the defendants presented evidence that Goodyear trained its employees on the safe handling of benzene, there is a conflict in the testimony with respect to whether such training was actually provided to these decedents. The evidence is also inconclusive with respect to whether or to what extent the plaintiffs' decedents were informed of the dangers by the unions. Viewing the evidence in the light most favorable to plaintiffs, defendants have not shown that they are entitled to judgment as a matter of law by reason of the "sophisticated user" defense.

Defendant Citgo, however, has presented evidence that shows that it is not liable to the personal representatives of the estates of Melvin Vondra and Patricia Meyers because it did not supply the allegedly harmful products to Goodyear while Vondra and Meyers worked at the Goodyear Lincoln plant. The plaintiffs do not dispute defendant Citgo's contentions. Accordingly, the court finds that defendant Citgo's motion for summary judgment should be granted with respect to the claims of plaintiffs Caryl Vondra, Personal Representative of the Estate of Melvin Vondra, and William Meyers, Personal Representative of the Estate of Patricia Meyers.

IT IS ORDERED:

1.  Defendant Barton Solvents motion for summary judgment (Filing No. 187) is denied.

2.  Defendants Shell Oil Company, Shell Chemical LP, Union Oil Company of California and Chevron U.S.A. Inc.'s motion for summary judgment (Filing No. 190) is denied.

3.  Defendant Citgo Petroleum Corporation's motion for summary judgment (Filing No. 198) is granted in part; the claims of Caryl Vondra, Personal Representative of the Estate of Melvin Vondra, against defendant Citgo Petroleum Corporation are dismissed; the claims of William Meyers, Personal Representative of the Estate of Patricia Meyers, against Citgo Petroleum Corporation are dismissed; defendant Citgo Petroleum Corporation's motion for summary judgment is denied in all other respects.

4.  Defendants' motions for hearings (Filing Nos. 188, 192, and 200) are denied.

DATED this 17th day of August, 2009.

BY THE COURT:

s/ Joseph F. Bataillon
Chief United States District Judge

---

*This opinion may contain hyperlinks to other documents or Web sites. The U.S. District Court for the District of Nebraska does not endorse, recommend, approve, or guarantee any third parties or the services or products they provide on their Web sites. Likewise, the court has no agreements with any of these third parties or their Web sites. The court accepts no responsibility for the availability or functionality of any hyperlink. Thus, the fact that a hyperlink ceases to work or directs the user to some other site does not affect the opinion of the court.